# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENNETH RAY HOLLAND, | Case No. 1:14-cv-00143-SMS |
| Plaintiff, | |
| v. | ORDER AFFIRMING AGENCY'S DENIAL OF BENEFITS AND ORDERING JUDGMENT FOR COMMISSIONER |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Kenneth Ray Holland seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits pursuant to Title II of the Social Security Act (42 U.S.C. § 301 *et seq.*) (the "Act").  The matter is before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Magistrate Judge.

Plaintiff contends that the Administrative Law Judge ("ALJ") failed to give legally adequate reasons for rejecting the opinions of treating physician Charles H. Touton, M.D., and examining physician Daniel B. Brubaker, D.O.  Following a review of the complete record and applicable law, the Court finds the decision of the Administrative Law Judge ("ALJ") to be supported by substantial evidence in the record as a whole and based on proper legal standards.

I. **Procedural History**

On May 5, 2010, Plaintiff applied for a period of disability and disability insurance benefits, alleging disability beginning January 1, 2010.  The Commissioner initially denied the claim on

January 5, 2011, and upon reconsideration, on May 26, 2011.  On June 10, 2010, Plaintiff filed a timely request for a hearing.

Plaintiff appeared and testified at a hearing on July 16, 2012.  On September 28, 2012, Administrative Law Judge Robert E. Lowenstein denied Plaintiff's application.  The Appeals Council denied review on December 4, 2013.  Plaintiff filed the complaint in this action on February 3, 2014.

**II.    Factual Background**

Plaintiff (born September 24, 1964), a carpenter, injured his back in a work-related accident on January 28, 2003.

**A.    Medical Records**

On March 12, 2003, orthopedist P. James Nugent, M.D., evaluated Plaintiff as a new patient after Plaintiff had been evaluated by industrial doctors and a chiropractor.  Plaintiff reported unbearable continual stabbing pain and ache, which he rated 8/10.  Pain was radiating into Plaintiff's groin, and he was experiencing muscle spasms in his low back.  Plaintiff displayed an antalgic gait and needed a cane to walk.  Testing revealed 20 percent flexion, 20 percent extension, and 20 percent lateral movement of the lumbar spine.  Sitting single leg raise was positive bilaterally.  Dr. Nugent administered a Toradol injection.[1]  When Plaintiff next saw Dr. Nugent on April 1, 2003, he reported that the Toradal injection had been helpful.

By July 21, 2003, Plaintiff had returned to work.  Dr. Nugent restricted Plaintiff to no lifting, no pulling or pushing over 20 pounds, and no bending.

Although Plaintiff was still working part time with restrictions on August 5, 2003, he was experiencing increased back pain, and his left leg had become numb again.  Because of the incapacitating pain, nurse practitioner Laura Duncan, with Dr. Nugent's approval, directed Plaintiff to stop working.

On August 11, 2001, Dr. Nugent recommended a course of epidural steroid injections.  On August 26, 2003, Dr. Nugent noted back and radicular pain, and injected epidural steroids.

---

[1] Toradol (Keterolac), a nonsteroidal anti-inflammatory drug (NSAID) is used to relieve moderately severe pain. www.nlm.nih.gov/medlineplus/druginfo/meds/a693001.html (May 8, 2015).

At a follow-up appointment on September 2, 2003, Plaintiff reported pain relief after the injection. After doing a lot of bending the day before, Plaintiff's pain had increased, but he declined Ms. Duncan's offer of a Toradol injection.

On September 5, 2003, physical therapist Russell Biggers found that Plaintiff had 45 percent flexion, 75 percent extension, and 100 percent left and right rotation, before Biggers was forced to discontinue movement testing due to Plaintiff's pain. Palpation revealed a moderate amount of increased muscle tension throughout the bilateral lumbar spine and spinal muscles. In addition, Plaintiff's L1-L5 centrals and unilaterals were slightly hypomobile. Biggers discharged Plaintiff from physical therapy, directing him to continue exercising at home.

On September 16, 2003, Dr. Nugent noted fair improvement following an epidural steroid injection. He recommended a series of injections.

On October 17, 2003, Plaintiff had again returned to work. To resolve Plaintiff's workers' compensation case, Dr. Nugent recommended a functional capacity exam to be followed by a permanent and stationary exam.

On November 17, 2003, Biggers reported that Plaintiff complained of continuous lumbar spine pain, at least 2/10 and reaching as much as 5/10. Plaintiff's lumbar spine retained 100 percent right and left extension and rotation; flexion was 50 percent; and left and right side flexion were 75 percent. Plaintiff was able to climb, kneel, squat, and work overhead, but he could not bend fully, repetitively, or in a constant static pattern. He could tolerate sitting, standing, and walking for about one hour before having to change position. Plaintiff was able to lift and carry up to 25 pounds and to push and pull up to 40 pounds. Biggers opined that Plaintiff could not return to his former work and recommended vocational rehabilitation.

On December 11, 2003, Dr. Nugent restated Biggers' pain and range-of-motion measurements. He opined that Plaintiff's injury was permanent and stationary. Plaintiff was then taking Darvocet and Naproxen as needed for pain.

On March 23, 2004, Dr. Nugent evaluated a job analysis for construction estimator. He opined that construction estimator was a reasonable proposal and that Plaintiff was physically able to perform the job.

On May 25, 2004, Plaintiff was experiencing pain in both hips.  Dr. Nugent gave him a Toradol injection and changed his prescription from Darvocet to Vicodin.  Plaintiff had developed a limp, which might have been increasing his pain.

On June 22, 2004, the California Division of Workers' Compensation determined that Plaintiff had a thirty per cent permanent disability as a result of the work accident and awarded a financial settlement.

On December 3, 2004, Plaintiff's secondary treating physician, Troy H. Smith, M.D., noted that Plaintiff had relocated from Fresno to the Bay Area.  Dr. Smith asked the compensation carrier to assign a new orthopedist so Plaintiff would not need to return to Fresno for medical appointments. The record includes no further record of medical treatment for Plaintiff until April 2010.

Plaintiff was laid off from his job as a construction supervisor on or about January 1, 2010.

On April 27, 2010, medical personnel in the emergency room of St. Agnes Medical Center treated Plaintiff for exacerbation of chronic lower back pain and hip pain.  He had no loss of bowel or bladder control, and "sensory and vein" were intact.  AR 233.  Medical personnel gave him Dilaudid[2] and Zofran.[3]

On September 17, 2010, orthopedist Charles H. Touton, M.D., prepared an orthopedic evaluation for the State Compensation Insurance Fund.  Plaintiff reported increasing back pain, accompanied by discomfort and tingling in his right thigh.  He last had an evaluation and MRI in 2004, although he reported that his back pain had continued since then.  He used various pain medications, including Vicodin and medical marijuana.

Plaintiff had significant limitation of motion in all directions.  He stood erect but walked stiffly.  Although his hip examination was relatively normal and he could sit upright on the table, Plaintiff's hip flexion of 13 degrees was "well below expected values."  AR 258.  His lower extremities revealed no measurable atrophy.  Range of motion in the hips, knees, and ankles was

///

---

[2] Dilaudid (Hydromorphone) is used to treat severe pain in people who are expected to need pain medication around the clock for a long time and who cannot be treated with other medications.
www.nlm.nih.gov/medlineplus/druginfor/meds/a682013.html (May 8, 2015).
[3] Zofran (Ondansetron) is an anti-emetic used to relieve nausea and vomiting caused by chemotherapy, radiation treatments, and surgery.  www.nlm.nih.gov/medlineplus/druginfor/meds/a601209.html (May 8, 2015).

normal.  Straight leg testing was only mildly positive at 65-70 degrees.  Femoral stretch and manual muscle testing were normal.  Deep tendon reflexes were symmetrical at the knees and ankles.

Dr. Touton diagnosed signs and symptoms of mechanical lower back pain with some symptoms suggesting a possible radicular component at L4 or L5.  He prescribed Diclofenac[4] and Vicodin,[5] and suggested that occasional use of a "working man's belt" was appropriate.

On October 5, 2010, Daniel B. Brubaker, D.O., diagnosed herniated lumbar discs L4-L5-S1, muscle spasm, chronic lower back pain, and osteoarthritis in hips and elbows.  He prescribed medical cannabis.

On October 15, 2010, radiologist Robert Schier, M.D., reported that magnetic resonance imaging (MRI) revealed an 8–mm right paramedian and posterolateral bulge at L2-L3, which was compressing the thecal sac on the right and extending into the right lateral recess with mild left and moderate right foraminal narrowing.  There were also bony and disc changes at L3-4 and L4-5 with mild right and moderate left foraminal narrowing.

When Dr. Touton reviewed the MRI images during follow-up appointment on October 18, 2010, he considered the results more serious than Dr. Schier's impression suggested.  Of particular concern was L2-L3 which showed irregularity, marrow changes in the vertebral bodies above and below, and a sizeable disc herniation posterolaterally on the right, which significantly impinged on neural elements.  Dr. Touton expressed concern about the possibility of disc space infection, significant disc herniation, radiculitis and radiculopathy, or osteomyelitis.  He recommended EMG and nerve conduction studies, a technetium bone scan, and laboratory studies to evaluate the possibility of infection.

Agency consultant Fariba Vasali, M.D., who was certified in physical medicine and rehabilitation, performed a comprehensive internal medicine examination of Plaintiff on October 20, 2010.  He noted low back pain resulting from an industrial accident about seven years before.

---

[4] Diclofenac is prescribed to relieve mild to moderate pain.  In its delayed release form, Diclofenac is prescribed to relieve the pain, swelling, tenderness, and stiffness of arthritis.  www.nlm.nih.gov/medlineplus/druginfo/meds/a689002.html (May 8, 2015).

[5] Vicodin (hydrocodone bitartarate and acetaminophen), a Schedule II narcotic, is prescribed for moderate to moderately severe pain.  www.vicodin.com/hcp?cid=ppc_ppd_vcdn_ggl_ppc_3202 (May 8, 2015).

1  Plaintiff's medications were Hydrocodone, Baclofen,[6] and prescription cannabis.

2       Plaintiff told Dr. Vesali that he had been laid off from work about one year before.  Because

3  of his back pain, he did not shop or do chores around the house.  He still drove.

4       Dr. Vesali diagnosed chronic low back pain.  He opined that Plaintiff's condition would not

5  "impose any limitations of 12 continuous months."  AR 246.  He found no limitations in standing

6  and walking, sitting, or lifting and carrying, and opined that Plaintiff had no postural, manipulative,

7  or environmental limitations. Although Plaintiff was using a cane that had not been prescribed, he

8  did not need an assistive device for ambulation.

9       On October 20, 2010, radiologist J. Charles Smith, M.D., reported moderate disc narrowing

10  and osteophyte formation, particularly at L2-L3, with milder disc narrowing and osteophyte

11  formation at L3-L4.  Dr. Smith observed no other acute abnormality.

12       Fred Logalbo, M.D., reviewed a spinal bone and joint scan administered at St. Agnes

13  Medical Center on October 22, 2010.  Dr. Logalbo noted moderately active spondylosis at L2-L3

14  and degenerative changes of the facets on the left at dorsal 8-9.

15       On October 25, 2010, neurologist Frank L. Cantrell, M.D., reported a normal EMG of

16  Plaintiff's bilateral lower extremities.  The nerve conduction velocity study was abnormal and

17  compatible with mild peripheral neuropathic process.

18       On October 25, 2010, Dr. Touton received the report on the technetium bone scan, which

19  reported moderate active spondylosis at L2-L3 and degenerative changes in the facet joints,

20  particularly at T8-T9.  The findings were not consistent with disc space infection or osteomyelitis.

21       On October 29, 2010, Dr. Touton recommended that the compensation fund refer Plaintiff for

22  a consultation with a conservative spine surgeon.  On November 8, 2010, in response to questions of

23  causation raised by the compensation fund and receipt of additional information regarding Plaintiff's

24  2003 injury, Dr. Touton agreed that Plaintiff's current disc herniation was not a result of the earlier

25  injury.

26  ///

27

28  _____
[6] Baclofen acts on the spinal cord nerves to decrease the number and severity of muscle spasms caused by spinal cord disease.  It relieves pain and improves muscle movement.  www.nlm.nih.gov/medlineplus/druginfo/meds/a682530.html (May 8, 2015).

On December 10, 2010, Dr. Touton observed that Plaintiff's condition was unchanged and again recommended a surgical consultation to determine whether Plaintiff was a candidate for spinal fusion.[7]

C. Fracchia, M.D., completed a physical residual functional capacity assessment on December 29, 2010. Dr. Fracchia identified Plaintiff's diagnoses as chronic low back pain with underlying lumbar degenerative disc disease and degenerative joint disease, most prominent at L2-3, and mild peripheral neuropathy of the lower extremities without evidence of radiculopathy. He rejected the medical source statement provided by the consulting examiner as unsupported by the objective findings in Plaintiff's medical record. Dr. Fracchia opined that Plaintiff could lift twenty pounds occasionally and ten pounds frequently; could stand or walk six hours in an eight-hour workday; could sit about six hours in an eight-hour work day; had unlimited ability to push and pull; could frequently balance; and could occasionally stoop, kneel, crouch, crawl, or climb ramps, stairs, ladders, ropes, or scaffolds.

At a six-month check-up with Dr. Touton on July 14, 2011, Plaintiff was experiencing "essentially mechanical pain" in his lower back, "aggravated by most activities." AR 440. His prescriptions included hydrocodone, Vicodin, and Diclofenac. Although extension and side bending were "relatively preserved," forward flexion was limited, with Plaintiff only able to bring his fingertips to the level of his knees. AR 440. Gait was normal. Seated straight leg raise was negative.

When Plaintiff next saw Dr. Touton on April 27, 2012, he was overdue for his six-month check-up. Plaintiff continued to experience lumbar spine symptoms with no radiculitis or radiculopathy. Range of hip motion was normal, but lumbar mobility was "quite decreased." AR 442. Dr. Touton instructed Plaintiff again on appropriate stretching exercises, instructing him to work particularly on extension.

Plaintiff sought to renew his disabled person parking sticker and his prescriptions for Diclofenac and Vicodin. He asked Dr. Touton for medication to help him sleep. The doctor noted, "Since he is using a cane to get around, he appears to qualify for a handicap parking sticker." AR

---

[7] Nothing in the record indicates that Plaintiff ever sought a surgical consultation.

442.  Dr. Touton prescribed Soma (Carisprodal) to help Plaintiff sleep, warning him to use it no more than four times weekly.  On May 2, 2012, the compensation plan disallowed the Soma, noting its potential for abuse, particularly when prescribed with tramadol or hydrocodone.

On September 30, 2011, Dr. Brubaker diagnosed arthritis in Plaintiff's hips, elbows, wrists, and knees, protruding discs at L4-L5 and L5-S1, muscle spasms, and chronic pain.  He renewed Plaintiff's medical cannabis card.

After reviewing Plaintiff's MRI results from October 14, 2010, Dr. Brubaker completed a medical source statement dated July 27, 2012.  He opined that Plaintiff could occasionally lift or carry up to ten pounds; could sit or stand without interruption for fifteen minute; could walk without interruption for fifteen to thirty minutes; could occasionally handle, push, pull, and reach overhead; could frequently reach (all directions except overhead), finger, and feel; could occasionally operate foot controls; could never climb, balance, stoop, kneel, crouch, or crawl; could never be exposed to unprotected heights, moving mechanical parts, or extreme heat or cold; could occasionally operate a motor vehicle, and be exposed to humidity, wetness, dust odors, and fumes.  In a typical eight-hour work day, Plaintiff could sit for 15 minutes, stand for fifteen minutes, and walk for fifteen to thirty minutes.  He needed to alternate between sitting, standing, and lying in a neutral position.  Plaintiff could not ambulate without use of a cane, but did not need a wheelchair or walker.  He could climb a few steps at a reasonable pace with use of a single handrail (marginal), prepare a simple meal and feed himself, and care for his own personal hygiene.  He could not perform activities like shopping, walk at a reasonable pace on rough or uneven surfaces, or use standard public transportation.  Dr. Brubaker commented, "Patient had a work injury in 2001.  Insurance carrier never authorized surgery.  Now he has progressively gotten worse."  AR 454.

### B.     Subsequent Medical Opinion

Dr. Touton completed a different form of medical source statement on October 27, 2012, after the ALJ had issued the hearing decision.[8]  He described Plaintiff as suffering low back and right lower extremity pain, recently in the anterior and medial thigh.  He had a reduced range of lumbar spine motion, joint instability, impaired sleep, weight change, tenderness, muscle spasm,

---

[8]  Dr. Touton's October 2012 opinion was submitted to the Appeals Council as additional evidence.

muscle weakness, and abnormal gait (uses cane).  Plaintiff's pain might be affected by his depression and anxiety (Dr. Touton "was not certain").  AR 457.  Plaintiff's pain was frequently severe enough to interfere with attention and concentration.  He had severe limitations in dealing with work stress. Plaintiff could continually sit for fifteen minutes to one hour before needing to stand or walk for fifteen minutes to one hour.  He could sit for a total of four hours in an eight-hour work day.  He did not need to raise his legs while seated.   Plaintiff could stand or walk for less than fifteen minutes before he would need to lie down for one to two hours.  He could stand for a total of one to two hours in an eight-hour work day.  To relieve pain, Plaintiff would need to rest more frequently than the usual breaks at two-hour intervals for a total of four to five hours of rest.  He could occasionally lift up to five pounds, balance on level terrain, flex or rotate his neck, reach, or handle, but could never stoop.  Plaintiff would never attend work and was "currently unemployable." AR 460.  His condition had existed and persisted with these restrictions since his injury in 2003.

### C.   **Plaintiff's Testimony**

Plaintiff used a walker when he attended the hearing.  Holding on to it gave him hand pain. Although his doctors had not prescribed them, Plaintiff had purchased a walker and a cane.  Plaintiff used his walker outside his home and his cane inside.  He wore a back brace.  To relieve pain, Plaintiff applied heat and cold, and used a TENS unit nightly.

Plaintiff lived in a second floor apartment with his wife.  He hoped eventually to be able to move to a first floor apartment where he would not have to climb twelve to fourteen steps.  His wife helped him get up and down the steps and, even though Plaintiff was still licensed, did all the driving.  Plaintiff's wife also helped him dress and shower, and sometimes wiped him after he used the toilet.

Plaintiff had constant pain, like being stabbed with a knife in his center and lower back and hips, and frequent muscle spasms.  The pain travelled down his sciatic nerve almost to his knee.  In addition, Plaintiff had numb spots in his lower back.  After years of working as a carpenter, Plaintiff also complained of hand and arm pain.

///

///

Plaintiff used medicinal marijuana to relieve his pain and nausea.  He saw a physical therapist weekly[9] and Dr. Touton every six months.  The physical therapist helped stretch Plaintiff out, relaxed his tight muscles, and put his hip back in place weekly.

Plaintiff slept poorly.  On a typical day, he moped around and watched television.  He was moody.  Taking Soma made him tired all the time.  He took two naps daily for 30 to 45 minutes.

Although Plaintiff used to hunt, fish, boat, and golf, he now just watched television.  He had always worked, never taking a vacation.  Now he rarely left his apartment since it was difficult to manage the stairs and to enter and exit the car.  He did no household tasks such as cooking, shopping, dishwashing, laundry, or bed making.

Plaintiff testified that he could stand for ten to fifteen minutes, and walk with assistance for a distance of two or three "house yards" before becoming winded.  He needed alternately to sit, stand, and lie down.  In an eight-hour day, he stood a total of two hours and sat the rest of the time.  Explaining that a gallon of milk was too heavy to lift without pain, Plaintiff thought he could lift a pound or two.

Plaintiff dropped out of high school before completing tenth grade and went to work.  He had no technical training except for vocational training provided after he was injured.  Following training, he took a job doing construction management but his back was so painful that he missed two or three days of work each week.  In addition, his medications left him "dinged out."  In late 2009 or 2010, his employer terminated him.[10]

### D.   Plaintiff's Exertion Report

When Plaintiff completed an exertion questionnaire dated August 5, 2010, he was living in a single family home with his wife and a friend.  Plaintiff complained of constant pain, weakness, inability to stand or sit for more than ten minutes at a time, fatigue, moodiness, lack of focus, inability to bend or lift, nausea, shortness of breath, dizziness, and back spasms.   He could sleep only two hours before being awakened by pain. He napped daily for two hours.

///

---

[9] The record includes no documentation of physical therapy during this time period.
[10] In an adult disability report dated May 26, 2010, Plaintiff reported that he was laid off from his job because of the economy.

Plaintiff stated that, because he had no medical coverage, he was "self medicating."  AR 198. He took Vicodin three times a day, Norco up to three times a day, and took time-released morphine often.  He used a cane, and when his pain was too severe to walk, he used a wheelchair.

He tried to walk around the block each day; it took him an hour.  He did not climb stairs and could not lift anything over five pounds.  Pain limited his driving to about six miles.  Because of his pain, Plaintiff's wife did the shopping and housecleaning.  Plaintiff could perform light weed pulling and sometimes watering.

### E.    Third-Party Function Report

Plaintiff's wife, Vickie Thomas Holland, completed a third-party function report on March 15, 2011.  Mrs. Holland reported that the couple were then living with family in a house.  Plaintiff couldn't do much and needed help to get dressed, to get meals, and to clean up.  When he moved his back hurt, waking him up at night.  He needed help with shoes, socks, and sometimes pants; stepping in and out of the shower; combing and washing his hair; and getting down and up from the toilet. Plaintiff used a cane, walker, and wheelchair.

Plaintiff accompanied his wife grocery shopping once a week, walking slowly with his cane. He was still driving. He could talk, play cards, and use the computer or phone.  Because it was too painful to go places, he had no social life.  Lack of sleep left him agitated and grumpy.

### F.    Vocational Expert Testimony

Vocational expert John Komar, Ph.D., CRC, testified that Plaintiff's past relevant work included construction worker I (DOT No. 869.664-014, heavy, SVP 4) and construction superintendent (DOT 182.167-026, medium exertion, SVP 7).  Plaintiff performed his construction superintendent work at the light exertion level.

For the first hypothetical question, the ALJ directed Dr. Komar to assume an individual of Plaintiff's age, education, and work experience who had no limitations on standing, walking, sitting, lifting, or carrying; did not need an assistive device; and had no postural, manipulative, or environmental limitations.  Dr. Komar opined that the hypothetical person could perform either of Plaintiff's past jobs.

///

11

For the second hypothetical question, the ALJ directed Dr. Komar to assume a hypothetical person, who could lift twenty pounds occasionally and ten pounds frequently; stand and walk six hour in an eight-hour workday; push and pull an unlimited amount; occasionally climb ropes, ladders, stairs, ramps, or scaffolds; frequently balance; occasionally kneel, crouch, or crawl; and had no other limitations.  Dr. Komar opined that the second hypothetical person could not perform either of Plaintiff's past jobs.  Drawn from the knowledge base of the different aspects of construction and the business aspect of construction, the hypothetical person would have skills transferable to the occupation of construction estimator (DOT No. 169.267-038, sedentary, SVP 7).  He could also work as an order caller (DOT No. 209.667-014, light, SVP 2), with 1700 jobs in California and 15,800 jobs nationally, or a ticket taker (344.667-010 (DOT No. 344.667-010, light, SVP 2), with 3100 jobs in California and 32,400 jobs nationally.

For the third hypothetical question, the ALJ directed Dr. Komar to assume a hypothetical person who could sit or stand for five minutes at a time, and could lift and carry up to five pounds. The hypothetical person would need to use a walker when outside and a cane inside, and would require two or three unscheduled work breaks for thirty minutes each.  He would also miss work three or four times monthly.  Dr. Komar opined that no jobs would be available for the third hypothetical person.

## III.   Discussion

### A.   Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making

findings, the Commissioner must apply the proper legal standards.  *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  The Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards and the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).  "Where the evidence as a whole can support either outcome, we may not substitute our judgment for the ALJ's."  *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).

### B.    Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. See 42 U.S.C. § 423(d)(2)(A); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy.  *Id.*

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability.  20 C.F.R. §§ 404.1520; 416.920.  The process requires consideration of the following questions:

Step one:    Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

Step two:    Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.

Step three:    Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.

Step four:    Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.

Step five:    Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

13

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).  If a claimant is found "disabled" or "not disabled" at any step, the remaining steps need not be addressed.  *Tackett*, 180 F.3d at 1098.

At steps one through four, the claimant bears the burden of proof, subject to the presumed non-adversarial nature of Social Security hearings and the Commissioner's affirmative duty to assist claimants in developing the record whether or not they are represented by counsel.  *Tackett*, 180 F.3d at 1098 n. 3; *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996).  If the first four steps are adequately proven, the burden shifts to the Commissioner to prove at step five that considering the claimant's residual functional capacity, age, education, and work experience, he or she can perform other work that is available in significant numbers.  *Tackett*, 180 F.3d at 1098; *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of January 1, 2010.  His severe impairments were degenerative disc disease and degenerative joint disease most prominent at L2-L3 with mild peripheral neuropathy in the lower extremities without evidence of radiculopathy, but with severe pain, and osteoarthritis of the hips and elbows.  None of these impairments alone or in any combination met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appx. 1 (§§ 404.1520(d), 404.1525, and 404.1526).  Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b), except that he was limited to no lifting over 25 pounds, no pushing or pulling greater than 40 pounds, and no repetitive, continuous, or status bending of the lumbar spine.  Plaintiff was unable to perform any past relevant work.  Nonetheless, considering Plaintiff's age, education, work experience, and residual functional capacity, he could perform other jobs that exist in significant numbers in the national economy.  Accordingly, the ALJ concluded that Plaintiff was not disabled.

///

///

14

## C.      The ALJ's Analysis

Plaintiff contends that the ALJ failed to properly evaluate the opinions of treating physician Dr. Touton and examining physician Dr. Brubaker.[11]  He emphasizes that Dr. Touton endorsed his disability by justifying his need for a handicapped parking permit by reference to Plaintiff's use of a cane, and that the ALJ's reliance on Dr. Nugent's opinion following the 2003 accident was inappropriate.  The Commissioner disagrees, contending that the record as a whole supports the ALJ's conclusion that Plaintiff was capable of light work with modifications.  After reviewing the hearing decision in light of the record as a whole, the Court agrees that the ALJ's determination was supported by substantial evidence.

### 1.      Plaintiff's Credibility

To understand the ALJ's analysis fully, the reader must first understand that the ALJ concluded that Plaintiff lacked credibility.  The ALJ wrote:

> The record indicates that the claimant stopped working due to a business-related layoff rather than because of the allegedly disabling impairments.  Further, there is no evidence of a significant deterioration in the claimant's medical condition since that layoff.  A reasonable inference, therefore, is that the claimant's impairments would not prevent the performance of that job, since it was being performed adequately at the time of the layoff.

> Although the claimant has described daily activities which are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled.  First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty.  Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to all other reasons, in view of the weak medical evidence and other factors discussed in this decision.  Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision.

> AR 17-18.

Plaintiff does not address this portion of the hearing decision.

---

[11] Although Dr. Brubaker is arguably a treating physician, Plaintiff classifies him as an examining physician.  Because Dr. Brubaker's classification is immaterial to the Court's analysis, it uses the classification used by Plaintiff.

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement. *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). But if he or she decides to reject a claimant's pain testimony after a medical impairment has been established, the ALJ must make specific findings assessing the credibility of the claimant's subjective complaints. *Ceguerra v. Secretary of Health and Human Services*, 933 F.2d 735, 738 (9th Cir. 1991). *See also Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988). He or she must set forth specific reasons for rejecting the claim, explaining why the testimony is unpersuasive. *Orn*, 495 F.3d at 635. *See also Robbins v. Social Security Administration*, 466 F.3d 880, 885 (9th Cir. 2006). The credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms. *Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may consider "(1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008), *quoting Smolen*, 80 F.3d 1273. If the ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her decision. *Thomas*, 278 F.3d at 959.

16

Substantial evidence supported the ALJ's conclusion that Plaintiff had been able to work as a construction manager through his last day of work on December 31, 2009.  After recovering from his 2003 on-the-job injury, Plaintiff had worked approximately six years, from some time in 2004 through the end of 2009.  In an interview with agency employee L. Cameron on May 26, 2010, Plaintiff stated that he had been laid off due to the economy.  AR 175.  On November 24, 2010, Plaintiff told the agency that "his supervising position did not last long."  AR 199.  According to Dr. Vesali, Plaintiff said he had been "laid off."  AR 244.

In contrast, Plaintiff testified that his physical condition had so deteriorated that by 2009, he was missing excessive work days and was laid off because he could not perform the job.  AR 42.  No other evidence supports this assertion.  And the administrative record includes no evidence of medical treatment from the time Plaintiff saw Dr. Smith in December 2004 until he sought pain medication in the St. Agnes emergency room in April 2010, four months after he stopped working.

Resolving such contradictory evidence is the role of the ALJ.  Although the resolution here is not favorable to Plaintiff, substantial evidence supported the ALJ's conclusion (1) that Plaintiff's employment ended due to economic conditions, not because Plaintiff's physical condition had made him unable to perform his work as a construction manager; (2) that Plaintiff's allegedly limited daily activities could not be "objectively verified with any reasonable degree of certainty" (AR 17); and (3) that, in light of "relatively weak medical evidence," among other things, Plaintiff's limited daily activities were not clearly attributable to his medical condition.  In addition, Plaintiff's lack of credibility taints any other evidence, including physicians' opinions, that relied on Plaintiff's subjective representations.

## 2.    Sources of Medical Opinions, in General

Physicians render two types of opinions in disability cases: (1) medical, clinical opinions regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to perform work.  *See Reddick*, 157 F.3d at 725.    The regulations provide that medical opinions be

evaluated by considering (1) the examining relationship; (2) the treatment relationship, including (a) the length of the treatment relationship or frequency of examination, and the (b) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that support or contradict a medical opinion. 28 C.F.R. § 404.1527(d). An ALJ is "not bound by an expert medical opinion on the ultimate question of disability." *Tomasetti*, 533 F.3d at 1041; S. S. R. 96-5p.000

Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant (nonexamining physicians)." *Lester*, 81 F.3d at 830. A treating physician's opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a non-examining physician. *Id.* The Social Security Administration favors the opinion of a treating physician over that of non-treating physicians. 20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631. A treating physician is employed to cure and has a greater opportunity to know and observe the patient. *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987). Nonetheless, a treating physician's opinion is not conclusive as to either a physical condition or the ultimate issue of disability. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

Once a court has considered the source of a medical opinion, it considers whether the Commissioner properly rejected a medical opinion by assessing whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. The ALJ may reject the uncontradicted opinion of a treating or examining medical physician only for clear and convincing reasons supported by substantial evidence in the record. *Lester*, 81 F.3d at 831. Even though the treating physician's opinion is generally given greater weight, when it is contradicted by an examining physician's opinion that is supported by different clinical findings the ALJ may resolve

the conflict. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995). The ALJ must set forth a detailed and thorough factual summary, address conflicting clinical evidence, interpret the evidence and make a finding. *Magallanes*, 881 F.2d at 751-55. The ALJ need not give weight to a conclusory opinion supported by minimal clinical findings. *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999); *Magallanes*, 881 F.2d at 751.

Although an ALJ is not bound by uncontroverted opinions rendered by a plaintiff's physicians regarding the ultimate issue of disability, he or she cannot reject them out of hand, but must set forth clear and convincing reasons for rejecting them. *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993). The ALJ must tie the objective factors or the record as a whole to the opinions and findings that he or she rejects. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988). An ALJ is not required to accept the opinion of any physician, including a treating physician, if the opinion is brief, conclusory, and inadequately supported by clinical findings. *Thomas*, 278 F.3d at 957. When a treating physician's medical opinion is contradicted by the opinion of another physician, the ALJ is required to do no more than provide specific and legitimate reasons for discounting the treating physician's opinion. *Bray v. Commissioner of Social Security Admin.*, 554 F.3d 1219, 1228 n.8 (9th Cir. 2009). The ALJ did so here.

### 3.      Dr. Nugent's Opinion

Plaintiff contends that the ALJ erred in giving great weight to Dr. Nugent's opinion since it (1) was rendered on December 11, 2003, more than six years before Plaintiff claimed to be disabled and (2) addressed the abnormality at L5-S1 following Plaintiff's workplace accident rather than the disc bulge at L2-L3 that was the subject of his disability claim.

Plaintiff comments, "It is curious at best as to why the ALJ would give great weight to a stale report that is based on a different impairment altogether." Doc. 15 at 11. This Court is not surprised by the ALJ's reliance on Dr. Nugent's opinion. By repeatedly emphasizing the continuous deterioration of his condition from 2004 to 2010, Plaintiff himself defined his impairment as a single

continuing back ailment.  Throughout his testimony, Plaintiff represented that his December 2009 lay-off reflected an inability to perform his job due to his pre- existing and continually worsening disability.  Until his appeal to this Court, Plaintiff never suggested that the source of his back pain differed from 2004 to 2010.

The record is replete with examples of Plaintiff's representing his condition as a single ailment dating to the 2003 accident.  For example, when asked if he had tried to do construction management after he recovered from the 2003 accident, Plaintiff replied:

> I tried, and it didn't work.  I—I couldn't--my back was bothering me so much, I was missing days of work.  I was taking medications all the time and real moody, and just—no, it didn't work out.  It's—ever since then I've just been laying around trying to see what I could do.

AR 42.

Similarly, when treated at St. Agnes Medical Center in 2010, he attributed his back pain to his 2003 injury.  AR 235.  He told Dr. Vesali that his pain resulted from a work place accident seven years before.  AR 244.  Even Dr. Touton believed that the current injury was an exacerbation of the work place injuries until the State Compensation Insurance Fund pointed out that Dr. Nugent had treated L5-S1 and that Dr. Touton had diagnosed the current problem as occurring at L2-L3.  AR 252.  When advised that the new condition unrelated to the 2003 injury and that workers' compensation would not finance treatment in 2010, Plaintiff was "obviously unhappy" and asserted he was not receiving a "fair shake."  AR 269.

Having already rejected Plaintiff's claim that he was laid off based on his substantial impairments rather than for economic reasons, the ALJ considered Dr. Nugent's opinion just as Plaintiff depicted it—the opinion of the treating physician at the inception of a single continuing impairment.  Substantial evidence supported the ALJ's determination that Plaintiff's back complaints resulted from a continuous process that began with his 2003 back injury.

///

### 4.      **Dr. Brubaker's Opinion**

Asserting that, in September 2011, Dr. Brubaker "genuinely administered a new examination rather than recording the same findings from the previous examination" (AR 15 at 14-15), Plaintiff contends that the ALJ erred in rejecting without articulating specific and legitimate reasons Dr. Brubaker's opinion on Plaintiff's ability to do work.  The Court disagrees.  After a paragraph summarizing Dr. Brubaker's (identified as Muscular Skeletal Medical Associates, the name of Dr. Brubaker's practice) findings (AR 16), the ALJ wrote:

> Daniel B. Brubaker, D.O., saw the claimant for an initial cannabis evaluation on October 5, 2010, noting diagnosis of lumbar disc herniation, muscle spasms, chronic law back pain, and osteo arthritis of the hips and elbows.  Dr. Brubaker saw the claimant on one other occasion, September 30, 2011, for continuance of his cannabis prescription.  Dr. Brubaker submitted a Medical Source Statement opining that the claimant can occasionally lift 10 pounds, sit and stand for 15 minutes, and walk for 15-30 minutes.  Dr. Brubaker indicates the claimant cannot climb, balance, stoop, kneel, crouch or crawl.  No significant weight can be afforded this overly restrictive residual functional capacity.  Even if I were to assume that Dr. Brubaker's opinion is valid, he notes the limitations started on July 24, 2012, which would not meet the duration requirements of 12 months.  In addition, it is not supported by objective signs and findings, and Dr. Brubaker has only seen the claimant twice over a year's time.

AR 16-AR 17 (*citations to record omitted*).

The Court finds that ALJ's reasons to be specific and legitimate.  Further, to the extent that Plaintiff emphasizes Dr. Brubaker's statement "that [Plaintiff] could not perform regular and continuing work" (Doc 15 at 15),  Plaintiff is reminded that an ALJ is "not bound by an expert medical opinion on the ultimate question of disability."  *Tomasetti*, 533 F.3d at 1041; Social Security Ruling 96-5p.  "Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability."  *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).

The Court rejects Plaintiff's argument that Dr. Brubaker's notation next to the check box of weight and frequency of lifting, "Started 7/24/12" (AR 449), is too ambiguous for the ALJ to have concluded that Dr. Brubaker intended to indicate that Plaintiff's restrictions were applicable

beginning July 24, 2012.  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."  *Reddick*, 157 F.3d at 722.  The Court does not find the notation ambiguous and declines to second-guess the ALJ's resolution of the alleged ambiguity.

Finally, the Court notes that Dr. Brubaker addressed Plaintiff's present illness as if it were pain resulting from the 2003 injury, twice referring to the workplace injury of L4-L5, and never referred to the L2-L3 abnormality that was the subject of the 2010 disability claim.  AR 436; AR 437.  Thereafter, in his medical source statement, Dr. Brubaker contended that Plaintiff had gotten worse due to the workers' compensation plan's refusal to authorize surgery.  AR 454.  As such, Dr. Brubaker's examination clearly did not include any imaging studies to identify the source of Plaintiff's pain or any review of the diagnostic studies conducted by Dr. Touton.  The ALJ did not err in rejecting Dr. Brubaker's opinion.

### 5.        Dr. Touton's Signing the Disabled Person Parking Permit

Plaintiff contends that Dr. Touton's recognizing that Plaintiff walks with a cane and noting that he would therefore appear to qualify for a disabled parking permit indicates that Dr. Touton did "consider [Plaintiff's] use of a cane to be medically necessitated."  Doc. 15 at 9.  In turn, Plaintiff concludes that Dr. Touton opined that Plaintiff "needs to ambulate with a cane, and presumably cannot perform even the full range of sedentary work."  Doc. 15 at 9.  The Court does not accept Plaintiff's reasoning.  As the Commissioner points out, Dr. Touton did not offer an opinion of Plaintiff's functional limitations before issuance of the hearing decision.   Recognizing that Plaintiff was actually using a cane to get around and appeared to qualify for a disabled person parking permit does not imply that Plaintiff actually needed a cane or that he was unable to perform substantial gainful employment.  Indeed, Plaintiff himself testified that no physician prescribed any of his assistive devices: he simply purchased these items himself.

The Court declines to discuss this argument at length.  Of itself, possessing a disabled person placard or walking with a cane does not mean that an individual lacks the residual functional capacity to perform work.  The ALJ did not err by failing to interpret Dr. Touton's signing Plaintiff's DMV permit application to be an acknowledgement that Plaintiff was disabled.

### 6.   **State Agency Physicians**

Finally, Plaintiff contends that the ALJ erred in relying on the medical opinions of the state agency physicians, Drs. Han and Fracchia,[12] since these were not substantial evidence.  He criticizes the ALJ for accepting the opinions of Dr. Fracchia, a general practitioner, and Dr. Han, a pediatrician, over orthopedists such as Drs. Brubaker and Touton.  Although the ALJ gave the opinions of the state agency physicians "some weight" (AR 18) since they did not examine Plaintiff, he found that their opinions supported a finding that Plaintiff was not disabled.

Plaintiff's argument is premised on the Court's accepting his contention that the ALJ erred in relying on Dr. Nugent's opinion.  Because, as set forth above, the Court disagrees with Plaintiff's contention that the ALJ erred in relying on Dr. Nugent's opinion, Plaintiff's argument that a hearing decision cannot rest solely on the opinions of non-examining physicians falls away.

"The opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester*, 81 F.3d at 831 (*emphasis omitted*).  *See also Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); *Bell v. Astrue*, 640 F.Supp.2d 1247, 1254 (E.D.Cal. 2009).   Nonetheless, "[o]pinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record." *Thomas*, 278 F.3d at 957.  An ALJ does not err simply by basing his conclusion on a combination of limitations set forth

---

[12] Plaintiff also asserts that by citing exhibit 7F, the ALJ erroneously considered disability examiner N. Lee to have been a physician.  The Court rejects this fanciful argument. Exhibit 7F, the agency's case analysis, summarizes the objective findings and medical opinions that have been presented in the case, highlighting inconsistencies between reports and allegations.  In analyzing the agency physician's opinions, the ALJ's reference to this document does not indicate that he mistakenly took N. Lee to be a physician.

by non-examining physicians.  *Mendoza v. Astrue*, 371 Fed.Appx. 829, 831 (9th Cir. 2010).  If an ALJ determines to reject the opinion of a treating or examining physician in favor of a non-examining physician, he or she must provide "specific, *legitimate* reasons that are supported by substantial evidence."  *Nguyen v. Chater*, 100 F.3d 1462, 1466 (9th Cir. 1996).   For example, an ALJ did not err in rejecting the opinion of a treating physician when the decision was not based solely on the non-examining physician's opinion but also on test results, contrary reports of other physicians, and the claimant's own conflicting testimony.  *Magallanes*, 881 F.2d at 751-55.  Nor did the ALJ err in rejecting restrictions set forth by a treating physician when he carefully analyzed the various opinions' consistency with the severe impairments established by clinical findings.  *Sazhneva v. Comm'r of Social Security*, 2009 WL 3246979 at *8 (E.D.Cal Sept. 30, 2009) (No. CIV S-08-0300-CMK), *aff'd*, 427 Fed. Appx. 586, 587 (9th Cir. 2011).

The ALJ did not err in giving some weight to the agency physicians' opinions.

**D.**   **Summary**

Because of the timing of Plaintiff's application for benefits and inconsistencies in his testimony and in the evidence that he provided, the ALJ concluded that Plaintiff lacked credibility.  Whether for strategic or other reasons, Plaintiff further undermined his own credibility by omitting certain medical evidence from his application, providing no medical records for the over-five-year period from December 2004 to April 2010 and failing to document his claims of regular physical therapy after 2010.  The ALJ carefully addressed each element of medical evidence and explained his reasoning for the weight given to each factor and his ultimate conclusion.  His reasoning was clear, logical, and supported by substantial evidence.  Nothing further was required.

**IV.**   **Conclusion and Order**

The Court finds that the ALJ applied appropriate legal standards and that substantial evidence supported the ALJ's determination that Plaintiff was not disabled.  Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.

24

The Clerk of Court is DIRECTED to enter judgment in favor of the Commissioner and against Plaintiff.

IT IS SO ORDERED.

Dated:   **May 13, 2015**                              **/s/ Sandra M. Snyder**
                                                    UNITED STATES MAGISTRATE JUDGE